Thank you for indulging our need for a short break. Our next argued case is Cottonwood Environmental Law v. Bernhardt. Good morning, Your Honors. May I reserve five minutes for rebuttal, please? You may try to hold on to it if we don't ask too many questions. My name is John Meyer. I'm here on behalf of Cottonwood Environmental Law Center. I mooted this case twice last week with an environmental law professor and a former Department of Justice attorney. They both told me you have to make one point right out of the gate, and that is that this hunt is occurring on federal land. This is not state land. So what happens is I drew a very detailed sketch here. This is Yellowstone. Here's Yellowstone Park. And here's Forest Service land. And the Yellowstone bison walk out of Yellowstone Park, and 35, 40 people line up on the Forest Service land. As soon as bison leave Yellowstone Park, they start shooting. Zone 2 is on federal land? Yes, Your Honor. That is hugely important, and that's what these two attorneys told me to stress for you. Could I ask you sort of a structural question? And that is about the first cause of action about the tribal hunting. Could you talk about that? Yes, Your Honor. So the federal government has never done NEPA analysis for any hunting on federal land in terms of bison. So the Interagency Bison Management Plan says it wants to use hunting as a preferred method to manage bison, although they've never analyzed bison hunting in their NEPA analysis. But it's on federal land but under the control of the state. Is that right? In other words, the wildlife on federal land is under state control. Is that right? I don't think so, Your Honor. The Supreme Court in CLEPI said that the property clause gives Congress the power to protect wildlife on the public lands. They have the power, but I thought the thing is that they don't. I mean, they have handed over certain, I know this from other cases, there are certain kinds of wildlife issues that they have just made the province of the state. And so in this case, Your Honor, the federal government and state government implemented operating procedures under the IBMP. They said we're going to use hunting under the IBMP. We're going to implement hunting under the IBMP. They've never analyzed a hunt under the IBMP. In Alliance, was it on Montana land or was it federal land? So there is a 1992 case from Ninth Circuit, Lujan v. Fund for Animals. No, I'm not thinking about Fund for Animals. You're talking about the Alliance for Wild Rockies? Okay, okay, yeah. Yeah, that is federal land as well, I believe. Yeah, federal land. And yet the court didn't really highlight that as determinative. No. Okay, interesting. The way I frame this up is the district court made one finding. This thing, the bison plan was over and done with and complete, cites Norton. That's not really the argument that's being asserted. I understand now. Now the argument is, well, the federal government can't really, doesn't cause it and can't redress it because it's Montana that approves the hunting. So the argument you've just made is to that second point. And I don't mean to keep going on it. You've got time. But the district court actually came down on this on a different ground. Yes, it did, yes. And from a matter of common sense, it seems like the Forest Service should be able to manage what happens on Forest Service land. This is back to the second point. Yes. The one they're urging. Okay. Yes, Your Honor. Aside from that, there was, in fact, a NEPA analysis of the plan originally. Yes, Your Honor. So somebody thought that there was sufficient federal connection to have to have a NEPA analysis. Absolutely. And at one point they said, we may have to revisit this hunt if we go forward with the hunt. And they're now going forward with the hunt, both tribal and non-tribal, and they have not done the NEPA analysis. Under your slightly revised clarification, why are you suing Montana at all? And what's your authority to do so? The Supremacy Clause says that the federal courts can enjoin a non-federal actor if the both state and federal actor implement one action. In this case, the State of Montana and the federal government are hazing bison out of Forest Service land back in the Yellowstone Park, and then they both jointly quarantine bison, slaughter bison together. That's in the operating procedures for 2017. But you're agreeing the quarantining and the hazing occur on Montana land as distinct from the killing. No. No, it's all on federal land. It's all federal land. Yeah, I'm sorry. I want to be very clear. This is all federal land. But Montana isn't governed by NEPA. In this case, Montana signed a record of decision along with the federal government saying we're going to implement the IBMP through these procedures. But ordinarily, the only proper defendant in a NEPA action is the federal government because only it has a direct responsibility to perform the analysis. So, as far as just preparing the analysis, why isn't the federal government the only proper party? Well, we're also seeking to enjoin the quarantine and haze. And so, in this case – Well, different claims have different defendants, basically. Yes, ma'am. On what basis are you doing that? On what basis? What is the cause of action with regard to the quarantine and the haze? It's violations of NEPA, Your Honor. What violations of NEPA? That aren't the responsibility to devise a EIS. Yeah, so the former supervisor of Yellowstone National Park said we believe that we can increase the Yellowstone bison population. Excuse me. What is the cause of action if it's not that there should be a supplemental EIS with regard to those actions that you just specified to Judge Graber? What's the cause? What are you asking to have done under what statute? Oh, under NEPA, yeah. Where under NEPA? What under NEPA? 40 CFR section 15. No, I'm sorry. What is it if it's not that they have to devise a new supplemental EIS because of the possibility of more bison in the park? Then what is your claim? Your Honor, the claim has always been they have to prepare supplemental NEPA analysis. Right, but then Judge Graber said, but they don't have any responsibility to prepare a NEPA analysis. Then you said, oh, but we have another claim. What's the other claim? Oh, no, I'm sorry. I misspoke. It's all NEPA. I apologize. I misunderstood. In your reply brief on page 12, you cite fund for animals as the best authority for saying this is one integrated plan. Yeah, sure. But in that case, the court found that there wasn't, that the state wasn't liable, correct? Correct. So this isn't something where Montana needs approval, and it isn't something that's all funded by the U.S. government, correct? So what's the hook? So you said this isn't a case where Montana needs approval. Right. And that's to kill bison on state land. But this is federal land. And in this case, the federal government said we need to prepare NEPA analysis for the interagency bison management plan. Right, we need to because we're covered by NEPA. Yes. But the question, and it is true that the original documents contemplate that they were cooperatively developed, the EIS. But it appeared to me, and I couldn't quite tell this, that that was because the state has a parallel to NEPA and had to do a similar document anyway. So they were together going to do the document that was going to serve both purposes. Is that accurate? I believe so, Your Honor. All right. So what is the responsibility of Montana to prepare an EIS under NEPA? There isn't any. No, I don't think there is, Your Honor. You lose because that's the only thing you're asking them to do. I think that, well, so in the operating procedure for 2017, it says the federal and state agencies agreed on a plan to manage bison in Yellowstone National Park and set forth in the IBMP. Well, here's sort of another way to maybe ask the same question from a different angle. If, for the sake of this question, we were to conclude that the federal government has to prepare a supplemental EIS, what difference would it make whether Montana is or isn't part of a lawsuit at that point? They could be brought in to help with the EIS if the federal government wants them to. So what more would have to be done? Well, we're seeking to enjoin them while they prepare that supplemental NEPA analysis. We're concerned that even if we can enjoin the federal government from hazing Yellowstone bison on Forest Service land, that if the state is not a party, then they can continue hazing bison on Forest Service land. I'm sorry. I don't really follow that. If we said federal government, you may not haze or allow the hazing of these animals on federal land, why aren't they a sufficient defendant? Because the state would then, as the Forest Service said in its brief, the state would then be able to do whatever it wants. On state land? Yeah, but we're only talking about federal land in this case. Well, I know that. That's why I'm asking the question why the federal government isn't a sufficient defendant if it were enjoined from either hazing or permitting the hazing on federal land. Why isn't that sufficient if it's all federal land? Your Honor, I think that's a good question for the state defendants and the federal government because we are concerned that the state of Montana is going to haze bison on federal land into Yellowstone National Park. Well, international, my understanding is that your concern is with the hunt, as I understand it, primarily. The hunt is happening on federal land but not in the park, right? It's happening on federal land, correct, Your Honor? I know. I understand that. But your concern is with the hunt. That's one concern. The other concern is the quarantine. Yellowstone National Park quarantines and slaughters bison every single year. I read the paper last year, the Park Service is scheduled to slaughter 900 bison this year, and they're going to do that with the help of the state of Montana under the operating procedures for 2017. Now, we're saying if you prepare supplemental NEPA analysis, you might decide that you can increase the population of Yellowstone bison. If you do that, you don't have to slaughter them all. How does the quarantine issue hook up to the supplemental EIS? This quarantine and slaughter has been going on all along, right? The quarantine and slaughter has been going on for a long time. Are any of the new things that you're pointing to related to the quarantine and slaughter? Yes, Your Honor. What? The population number, as stated by the supervisor of Yellowstone National Park, in 2014 the National Park Service and the U.S. Forest Service, as well as the state of Montana, signed a memorandum of understanding saying we need to prepare new NEPA analysis for the quarantine because there's new information. And they were supposed to have that done by 2017. It's still not done. The new information is that you'll have more bison in the park. What does it have to do with the quarantine? So one of our members, Quentin Nagel, says, if you don't quarantine and slaughter all these bison, I can then see them, and that is my harm. I know, but that was contemplated by the original plan. What's new about it? There's new information. New information that's relevant to that. In what way? Yeah. I'm having a problem. The new information is that there can be an increased number of bison in Yellowstone National Park. And therefore? And therefore we don't have to quarantine as many or slaughter as many bison. Because? Oh, I'm sorry. I'm confused. My understanding is the bison in the park don't stay in the park. They leave the park. And they go on to Forest Service land. Right. Yep. And so if there are more bison in the park, then what? What does it have to do with anything? Because they're only in the park some of the time. They're still going out. Yeah, but the plan, the Interagency Bison Management Plan, covers the national park as well as the Forest Service land. Okay. And so that population number, that limit, 3,000, is set by the IBMP, the management plan. And so if the IBMP partners say, right now our limit is 3,000. We're going to set it now at 5,000 or 7,000. Then we don't have to slaughter all those bison. I think we understand your point. You have only a little over a minute left. Did you want to save that for about all? Yes, please. Thank you. Your Honor, I spilled some water here. I made a mess in your podium. Oh, no problem. I apologize. Your Honor. So Zone 2 is a tolerance zone that's not in Yellowstone Park, but it's still in federal land. Yes, Your Honor. Okay. All right. We'll hear from Mr. Haag next, I believe. Thank you, Your Honor. May it please the Court, I'm Mark Haag from the Department of Justice. Excuse me for mispronouncing your name. I apologize. With me at the council table is Raphael Graybill from the State of Montana and Daniel Wenner from the Intervenor Tribes. I'm going to take nine minutes, or try to take nine minutes, and Mr. Graybill will take six. So let me ask you at the outset, it seemed to me from the complaint and looking at the interagency bison management plan and the complaint, it seems to me there are two new things going on. In the first cause of action, there is a description of new tribal hunting, which I think means hunting by different tribes, as I understood the complaint, or it may mean just more. I wasn't clear on that. And then the new study showing that it's actually elk rather than bison that are the culprits in spreading disease. Are those sufficient to require a supplemental EIS as new information? I don't think so, Your Honor, but we didn't get to the merits. Those are the merits questions, and I don't think we're at the merits here. The argument on the merits is that the question is whether there are sufficient allegations. Right? Is that fair? I guess the first question is whether there's standing, and then the second question is whether those allegations would be sufficient to state a claim under NEPA. And our argument is that the new information about the 2017 brucellosis study and the tribal hunting, the allegations in the complaint are just too thin and unsubstantiated to state a NEPA claim. Well, we can discuss standing first if you want, but I don't know what's all that thin about them. I mean, they're pretty specific. There's this tribe, as I understand it, there's going to be additional hunting because there's a new tribe involved, and there's going to be an instance of the brucella study, which suggests that the whole premise of the hunt is or a premise of the hunt is no longer viable. So what's vague about it? I don't think the argument is that the brucellosis study makes the hunt not necessary. All right, let's go back to the beginning. Well, the third cause of action is about that. But in terms of the standing question, you're representing the government? The federal government. The federal agencies. All right, and tell me why there's no standing. Because they have not met their burden to show causation and redressability. The injury that they're claiming here is from the hunt and the hazing, both of which are actions of the state and the tribes. Well, A, it's true that this is on federal land, right? Yes. Well, it's a mix of Forest Service land, state land, and private land. But the land immediately outside the park is federal land? Is a mix of federal, state, and private, yes. So Montana licensees would have to get approval? From the state of Montana. And not from the federal government? The basic operating rules here are that states manage wildlife on federal land, within the boundaries of the state, even on federal land, unless there's some superseding federal regulation of that wildlife. So in the grizzly bear case, grizzly bears are a threatened species, and that imposes a set of federal requirements on the management of those animals. But bison are not a protected species. They're like any other wildlife species. This issue really hasn't been briefed, and I know it's been briefed in other cases. The fact that, as I understand it, the federal government has ceded the authority to the states and could take it back, but that's not the directly relevant question because nobody's asking you to take it back. It even hasn't been briefed as such. Well, yes, I think we argue in our brief that it's the state of Montana that authorizes the hunt and manages the hunt under the IBM. Well, that's true, but you don't deal with the fact that this is federal land as to which they're doing that by the grace of the federal government, essentially. Well, not by grace of any federal government decision that's being challenged here. Yes, that's what I was saying. So there's an issue about exactly how far back you go in the connection to the issue. But leaving that aside, this plan, when it originally was implemented, was subject to an EIS. Everybody knew that NEPA applied, right? Yes. And why isn't it still applying? Well, the plan is an umbrella for actions that multiple sovereigns are taking, the feds, the states, the tribes. Cooperatively. Cooperatively. Dynamically. Yes, cooperatively and dynamically. Well, and the reason I say dynamically is then you are not defending the district court's position that this isn't ongoing. I think that's right, we're not. We're taking a narrow view. And I appreciate that, but then I guess I really start and stop with alliance. It seems like it's indistinguishable. We've already addressed the fact when there's a cooperative dynamic plan that that could lead, could redress their harm, even if Montana's running the show, because if the federal government concluded that this new information about the elk and about the larger size, then federal government in this cooperative dynamic world might convince its state partners to not do so. That's the logic, and I thought that's sort of what we held distinctly under the NEPA analysis in the alliance case. Well, a key factor in alliance is that the species that was being impacted there, the grizzly bear. Well, you read it closely. That's under the ESA section, and then they have a separate, discreet NEPA section. Right, and that's also the presence of an ESA-protected species is also a factor for the NEPA analysis. Why is it relevant? It's one of the factors. No, but why is it relevant to the distribution of responsibility argument that you're resting on here? The NEPA case law and the standing case law is clear that when redress depends on the action of a third party, that the plaintiff has a higher burden to show redress. For that very reason, what difference does it make that in alliance there was an endangered species being affected? NEPA either applies or it doesn't apply. ESA is different because it can apply to private parties, as I understand it, but NEPA, in terms of the responsibility of developing an EIS, is unitary, and what difference does it make? The role of the Forest Service there to determine what the environmental impacts were going to be from hazing of grizzly bears is broader than the role if it's simply a generic wildlife species. But the court shouldn't rely on that at all. I'm looking again at that NEPA section of alliance. It does not mention endangered species or that being a factor at all. The only reference to it is in the beginning sentence, which says, as with the ESA claims, the federal defendants argue that alliance lacks Article III standing to pursue the NEPA claim because it cannot show blah, blah, blah, causation and redressability. That's the only mention of ESA was in a description of the federal defendants' argument. The actual holding, it says the procedural injury is redressable by the federal defendants. I'm looking at page 606, Your Honor, the paragraph that begins at 606 near the end of that paragraph. An impact on a threatened or endangered species is a factor that can give rise to the requirement to perform a supplemental EIS. Yes, that's substantive. That doesn't have to do with standing because there are other things that can give rise to the need for a supplemental EIS, including new information, correct? Yes, that's certainly correct. So it seems to me that that's why I asked the question I did at the beginning, which had to do with the new information in Claims 1 and 3, why that isn't sufficient to require a supplemental EIS. Our submission, Your Honor, is that the allegations in the complaint are too thin. If you look at the complaint, if you look at Cottonwood's brief, it's clear that what they're seeking here is for bison to be allowed to travel farther into Montana. They say that on page 3 of their brief. These concerns about quarantine are not addressed in their briefs. The word quarantine I think appears once in the complaint. What they want is for more bison to be allowed to travel farther into Montana, on federal land and on state land. Well, that's a merits argument. NEPA is a procedural process. Right, and it also goes to standing, Your Honor, as to whether the relief that they're seeking here could redress their harms. The oddity of your argument is that although you have this very extensive agreement, basically, joint management plan, which reads as if there are agreements between the various parties and that they're interdependent propositions, i.e., I'm going to do this and you're going to do that, and the suggestion is if I don't do this, you may not do that, right? So now you're trying to say that even though this document reads as if all the parties, I gather there was a great deal of dissension before this agreement was entered into and that the agreement basically settled disputes between the parties about who could do what. So if this agreement now, as you're representing it, is simply a set of declarations of what everybody could do anyway, then why do we have the agreement? Well, I think the agreement was adopted in settlement of litigation and it was intended to coordinate the separate authorities of these separate sovereigns. The sovereign's authorities to manage within their particular jurisdictions doesn't come from this agreement. It comes from their statutory or constitutional authority or organic act, but it comes from other places. The fact that the agreement provides this overall umbrella doesn't mean that everything that happens under the agreement is federal action or that everything that happens under the agreement is state action. And I think the allegations of the complaint here and Mr. Meyer's answers to your question suggest that he recognizes that the state can go forward with this hunting and this hazing whether it's not dependent on getting any federal approval for it. And that points out the nature of the agreement. I see my time. You're over your time, but we'll next hear from Mr. Graybill. Thank you. May it please the Court. My name is Rafe Graybill and I represent the Governor of Montana. In answer to Judge Berzon's question, the IBMP came about in response to decades of litigation around these complicated jurisdictional issues that come up where you've got absolute federal control in Yellowstone National Park. But when you leave the park, whether it's on Forest Service land, private land, or state land, you've got a well-established state sovereign police power, and that's from the 1992 case, Fund for Animals, that says the state has primary jurisdiction in controlling wildlife. So what the IBMP is, as the federal attorney mentioned, it doesn't independently confer authority. But the IBMP came out after that decision, correct? Correct. And I think what the IBMP recognizes, and this is replete in the documents that Cottonwood submits with its complaint, are recognitions that the jurisdictional authority of the different IBMP stakeholders don't change and that the source of environmental study responsibilities are demarcated in that document. So in the state of Montana, for example... Well, what's demarcated is that they're going to do it together. Well, I think the best way to think of the IBMP is an agreement to coordinate, to say litigation didn't work for dealing with these issues around disease control, conservation goals. So getting together effectively three times a year, which is what the IBMP partners do, and memorializing our goals not to interfere with each other, that's the aim of the IBMP. Well, one of the documents, I think it's the 2014 Memorandum of Understanding, specifies at the end that everybody will work to ensure that NEPA is complied with. So that's one of the pieces of understanding. And I guess my question is, if a supplemental EIS is to be required, it's not from the state of Montana. It is from the federal government. But as I understand it, Montana has pledged to cooperate with that process. Is that a fair understanding? Yes, and that's because Montana has independent state law obligations to study environmental consequences of its actions. One could certainly imagine a case in which Cottonwood would allege a state law, Montana Environmental Policy Act claim, alleging a duty of supplement. After three complaints, after jurisdictional discovery and a year of motions practice, that isn't the complaint that the court looks at now. What's the relief you're asking for? So you're not trying to say that an EIS isn't required. You're trying to say your client shouldn't be in this case. Correct. We're trying to say that both the way that the IBMP partners talked about their respective NEPA and Montana Environmental Policy Act responsibilities, one, and two, the way that Congress wrote NEPA and the way this court supplied it, both suggested in this case it's not NEPA that would compel the state of Montana's action. In light of the fact that the district court just had a highly truncated ruling, depending on an entirely different ground that no one's defending, wouldn't at most we remand to find out whether your representations about this partnership as one of just shared goals is correct? Or if, in fact, looking closely at it, inquiry, it is one where federal resources are being given to Montana. This is all beyond what the district court explored. Respectfully, no, for two reasons. One, because it's jurisdictional, and that's the Rattlesnake case, where this court said essentially when you allege improperly a NEPA claim against someone for whom NEPA does not apply, that's a jurisdictional dismissal. The inquiry there was does it constitute a single federal action? And because the district court went off on an entirely different theory, we've got no answer to that. You're representing that it's this loose agreement three times a year, shared goals. They're describing it as much more intricate, and the critical questions are ones of joint ventureship, approval, and financing. But the district court never answered those jurisdictional facts. Respectfully, Your Honor, I don't think there's really a dispute between the two parties here as to the level of federal control. I think all that's left for the court to do is determine are the standards set out in the Laub case, the Rattlesnake case, every time this court examines the funds. Laub was a remand for these very facts to be determined, correct? Right, and what sets Laub apart is in Laub there wasn't jurisdictional discovery. In Laub there was actually a state law claim, and in Laub the court described it as a contested matter about the level of federal control. Well, two things. First of all, the documents had an appendix, a memorandum of understanding about the National Park, et cetera, which is the 92 document, I think. It says the USFS, the NPS, and the State of Montana will be jointly responsible for the preparation of the plan and EIS. The EIS will comply with the requirements of the National Environment Policy Act, the Montana Environmental Policy Act, et cetera. The National Park's implementing procedures will be followed in the preparation of the EIS. So why? So they've essentially agreed to be part of the preparation of the EIS. Whether they had to do that or not, they have. There's an agreement to do it. So why doesn't that agreement make them proper defendants? Because when Montana, this is sort of the Fund for Animals case in 92, where NEPA contemplates these state-federal partnerships. So when the State of Montana participates in preparing an EIS or supplemental work afterwards, it does so pursuant to its state law authorities. But nowhere in the IBMP, and indeed examining the questions this Court asks when it determines whether something federalizes a state action, nowhere in any of those lines of questions does anything on these allegations here suggest that Montana has been federalized. And I don't think that Cottonwood... I don't think they're federalized, but they have an agreement to do X. So why can't the, is the problem that they have no authority to enforce this agreement? Well, I think the proper question would be, does NEPA provide an avenue to sue the State of Montana? Now, Montana certainly can voluntarily participate in a supplemental EIS, but again, that would be under its state law authorities. NEPA plus the contract. I don't know that I'd characterize the contract as the basis of the claim below for why Montana could be sued. I think the claim below is, frankly, advances a different standard than the one this Court's adopted. It says any time the state and federal government work together, NEPA obligations can graft onto the state. And that's simply not the standard this Court has ever adopted. Looking at the case law... But one doesn't have to say that here because there is an agreement as to this very issue. Correct, and I... So, therefore, you don't have to say, you know, just because they're cooperating in the sky, they're not cooperating in the sky, they have made a specific agreement to participate in this particular thing. Correct, Your Honor. And the language you read, actually, Montana says as we commit to work together in the EIS and IVMP activities, when we do so, the source of our environmental study responsibilities is one of state law. So let me ask you a similar question to the one I asked opposing counsel. If the federal defendants were the only defendants here, and if we were to say, or if a court were to say, there's standing, there's new information that requires a supplemental EIS, and there's an injunction against the federal defendants from either hazing or killing or allowing the hazing or killing of bison on federal lands, that would bind Montana to, in a sense, would it not? I think it wouldn't bind Montana through the IBMP. So the answer that opposing counsel gave you to that same question was, you've got to keep Montana in this case because Montana's going to keep doing the same stuff unless you do. And I think it's that very point that it's independent sources of authority, not the IBMP, not the federal. So you think that Montana continues to have the authority to kill bison on federal land, even if the federal government is told there shall be no more on federal land? So the federal government could close... Is that a yes or no? Yes. So you think you can keep killing them on federal land, even if the federal government is told you shall not allow this on federal land? And that's the Fund for Animals case. So I think the federal government, as a practical matter, could close off land and deny access to Montana hunters. That's a thing that could happen. But it's well established in the law of this court and the Supreme Court that wildlife management... Well, wouldn't they have to do that if that were the nature of an injunction, not to allow the killing? Wouldn't they be obliged to forbid Montana hunters from coming on the federal land? Correct. And I think that would limit the geographic scope of the hunt from federal lands. But as co-counsel mentioned, the land in Zone 2 is a mixture of state, federal, and private land. And that's, I think, a different question from the question of, from what authority does the state authorize a state hunt? But another question is, these... I don't know the answer to this question, but these bison are a large group of them. I've seen them recently in Yellowstone Park. And then they go out of Yellowstone Park. And the most direct question in this case seems to be, you know, how far... Where is the hunt going to occur? Now, does the National Park Service, which obviously has an interest in this herd of bison, have no interest in whether the hunt occurs here or there on federal lands? And, I mean, that's really the core question that's being asked to be addressed. Yes, Your Honor, and I see my time's expired. If I can answer. So the question of where the Zone 2 boundary is ultimately drawn is something that gets talked about at IBMP meetings as these partners get together and coordinate, you know, who's going to do what north of the border, who's going to do what south. Exactly. And on your representation, the Park Service and the Forest Service can't do anything north of the border. But that can't be right because they're talking about it all the time. Why? So the actual legal authority that says where the border is and that establishes the state hunt is the State of Montana's Fish and Wildlife Commission. Right. But the federal government has an interest in these bison, right, in these particular bison because they're often in the park and they're otherwise on federal land. And why would they be talking at all if the only thing they could do was just watch them leave the park and have nothing else to say about it? I think everyone has a shared policy interest in the bison, and certainly the federal government does as they leave the park. But it's clearly established both in the IBMP and the case law of this court that the legal interest, sort of ownership or responsibility over those bison when they go north, remains with the State of Montana. And it's precisely because when you cross this admittedly arbitrary political boundary... Montana's just being nice and talking to the federal government about this. Well, Montana spent decades litigating with the federal government over whether... Why were they litigating? Because the federal government thought they had some interest. Well, I think that all parties share certain shared interests. For example, disease control, conservation interests. And the parties found in their experience that getting together and trying to avoid litigation generally worked as a policy process better than serial litigation with various stakeholders at various times. The original agreement that I was reading from before with regard to the EIS lists out specific responsibilities to different groups in the single EIS. And it says the State of Montana is supposed to make contributions to the EIS regarding livestock management practices, wildlife management practices, brucellosis, and social and economic concerns. The U.S. Foreign Service has particular expertise, knowledge of and responsibility for habitat on national forest lands outside Yellowstone National Park, according to the agreement, and specific contributions include, but are not limited to, natural resources on U.S. Forest Service land, cultural resources on U.S. Forest Service land, land-use information, threatened and endangered species, which is only listed as one consideration, socioeconomic concerns. So this agreement, again, specifically recognizes federal concern and expertise about the U.S. Forest Service land, right? And Montana expertise related to that same land. So it seems like they're awfully interconnected. May I respond? Yes. Please do, and then we'll call it time after that. Thank you, Your Honor. So I think the fact of interconnection is clearly established here. These are issues that overlay. I think the question for this Court is, what is the statute you invoke to bring the governor of Montana into court to say, you have a duty of supplement? And I think the position of Cottonwood is, there is enough here that NEPA can do that for you. And I think if you go to this Court's case law, from Laub to Rattlesnake, every time this Court asks that question, the touchstone is, is there federal control? And I don't think the parties dispute that the governor of Montana simply is not subject to federal control when it comes to issues like hunting, treaty tribes exercising their rights, or hazing in the state of Montana. Thank you, counsel. Thank you. I believe, Mr. Meyer, you have some rebuttal time. Your Honors, in 2014, the state and federal defendants signed into a memorandum of understanding that says there is significant new information and changed circumstances regarding hunting, regarding brucellosis. They said, because of that, we need to prepare a new NEPA analysis. That new NEPA analysis has not been completed. We filed lawsuits saying there's even more information. Since the 2014 memorandum of understanding was signed, there is new information regarding these same things. We've stated a claim for relief. In the Lujan v. Fund for Animals Ninth Circuit case, the Ninth Circuit said it didn't have jurisdiction over the state of Montana because, quote, Montana has not entered into a partnership or joint venture that involves the In this case, the state of Montana has signed on. It is a partner in the Interagency Bison Management Plan. It's receiving goods. It's receiving help to haze, slaughter, quarantine Yellowstone bison. It fits. The district court didn't explore. Never did. The completely contrasting allegations you've got about this. The district court never even asked about whether this is an ongoing agency action. It was like a sua sponte dismissal without ever giving us a chance to brief it, to talk about it. And so we were a little dumbfounded when we got this decision. There's another group in Montana right now in front of a different district court judge who's challenging the IBMP under NEPA analysis. And they asked for an injunction to stop the hunt. And the judge didn't talk about whether it's an ongoing agency action, didn't talk about federal control, any of that, just denied the injunction. And so. And so that goes right to the point that any claim challenging the IBMP is other judges believe that that is a relevant claim. It's an adequate claim for relief. Thank you, counsel. The case just argued is submitted, and we appreciate the arguments from all of you.
judges: Graber, Berzon, Higginson